**McGRAW–HILL, INC., Plaintiff,**

v.

**COMSTOCK PARTNERS, INC., Comstock Partners Strategy Fund, Inc., and Comstock One, L.P., Defendants.**

**No. 89 Civ. 5574 (CMM).**

United States District Court,
S.D. New York.

June 28, 1990.

Darby & Darby, New York City, William
F. Dudine, Jr., Andrew Baum, for plaintiff.

Brumbaugh, Graves, Donohue & Raymond, New York City, Joseph D. Garon, Doreen L. Costa, for defendants.

METZNER, Senior District Judge:

Plaintiff, McGraw–Hill, Inc., has brought this action alleging trademark infringement against defendants Comstock Partners, Inc., Comstock Partners Strategy Fund, Inc., and Comstock One, L.P.

## I

In 1983 Commodity Quotations, Inc. (CQI) started to develop a system for electronically delivering "real time" price quotations from various exchanges. "Real time" is the transmission practically immediately after the creation of information from its source to whomever wants that information.

The system was first marketed in January 1985. On June 4, 1985, CQI obtained a service mark on "COMSTOCK" for the furnishing of "leasing access time to a computer data base in the field of stock and commodity trade quotation information." The name ComStock was intended to reflect that the service furnished commodity exchange and stock exchange prices. ComStock does not generate any of the data furnished to a subscriber. It does not change in any way the data transmitted. Its function is solely to be a conduit for the data.

A subscriber to the service pays an installation fee for a box called "TDI" which is hooked up to either a terminal or personal computer of the subscriber. The information furnished by CQI is transmitted into the box, and through the use of selective software, mainly developed by CQI, the information could be called up on the screen of the computer in a variety of forms, depending on the needs of the subscriber. It was this feature that is claimed to differentiate ComStock from other online, real time services.

The subscriber selects the services desired and pays a monthly fee, depending on the number of items of the plaintiff's "menu" that are selected. By the end of 1987, CQI had a thousand subscribers for ComStock's service.

Practically all of the advertising material and brochures of CQI refer to the name of the service as ComStock, with a slogan underneath reading, "Innovation in Real Time Market Quotations."

In 1988 McGraw–Hill was having problems in electronically transmitting financial data which it sold either through its own operations or subsidiaries, such as Standard & Poor (S & P). It came to the conclusion "that there exists major and significant product and information distribution opportunities for McGraw–Hill within the financial information services industry."

McGraw–Hill determined that the CQI product called "ComStock," which "provides real time prices and quotations for stocks, options, futures and foreign exchange," and also features Platt's Cash Market Petroleum Price Systems, should be purchased. Platt's is published by McGraw–Hill. The memorandum of a McGraw–Hill executive urging the purchase of CQI said: "It should be noted that this acquisition has significant strategic importance for McGraw–Hill's entry into the real-time, electronic commodity information market." Finally, it stated that "this acquisition fully supports McGraw–Hill's long-term goal of becoming a premier provider of electronic information to the financial services industry." Clearly, there was no intention to convert ComStock to an investment advisory service. It was intended that McGraw–Hill enter a new product line of furnishing real time information. It was also its intention to enlarge the distribution of its products through the conduit offered by ComStock's network, and of course to expand the type of service offered by ComStock.

The acquisition was consummated on December 15, 1988. In June 1989 a meeting was called to review the product list for introducing "S & P/McGraw–Hill Products on the Network." The products were S & P MarketScope, S & P News or McGraw–Hill News, S & P Blue List and MMSI.

In the fall of 1986, three employees of Merrill Lynch decided to leave their employment and form their own business venture. Stanley Salvigsen was the chief investment strategist at Merrill Lynch. Michael Aronstein was the senior investment strategist at that firm. Charles Minter was a vice president for institutional equity sales in that firm. Primarily, they wanted to establish themselves as money managers, in addition to furnishing long-term investment advice to private clients.

The name Comstock Partners, Inc. was chosen for the new venture, and a certificate of incorporation was filed on October 6, 1986. The name "Comstock" was chosen because it suggested the Comstock Lode, the famous silver mine of the nineteenth century from which many people became wealthy.

In March 1987 Comstock Partners, Inc. became the investment advisor of the Dreyfus Capital Value Fund, Inc., and it was in connection with the management of this fund that Comstock Partners, Inc. made its reputation. Comstock Partners, Inc. sold most of the fund's stock just prior to the October 1987 break. It sold stock short, and also invested in "Treasuries." Media coverage of this decision was extensive. The assets of this fund have increased from $18 million to $700 million under the management of Comstock Partners, Inc.

In the spring of 1988 Merrill Lynch created and underwrote the sale of stock in a closed end investment company called Comstock Partners Strategy Fund, Inc., with the sale of 110 million shares, which raised $1 billion. Merrill Lynch arranged for Comstock Partners, Inc. to be the investment adviser to this fund.

Defendant Comstock One, L.P. is a limited partnership of about 15 people, each of whom has invested a minimum of $1 million, and is managed by Comstock Partners, Inc.

Starting in June 1987, Comstock Partners, Inc. has issued a monthly bulletin called Comstock Investment Strategy Commentary. In addition, there is a quarterly report called Comstock Investment Strategy Review. These advisories are sent to about 150 clients at a cost of about $7,200 per subscription. The subscribers are large institutions, since the cost is too high for individual investors. The clients of Comstock Partners, Inc. come from personal referral. The firm does no advertising of its own.

The president of CQI became aware of Comstock Partners, Inc. in 1987 but took no action because he thought Comstock Partners, Inc. was engaged in real estate investments. However, in 1988, when he received a copy of the prospectus for Comstock Partners Strategy Fund, Inc., he took the matter up with his attorney, who sent a letter to Comstock Partners, Inc. claiming trademark infringement. Nothing came of this complaint because in the fall of 1988 McGraw–Hill evidenced its interest to buy CQI and all energies were devoted to consummating the acquisition.

On August 18, 1989, about eight months after the acquisition of ComStock by McGraw–Hill, this action was instituted.

## II

Plaintiff claims that its trademark has been infringed by the defendants' use of "Comstock." Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a) defines infringement as any colorable imitation where such use "is likely to cause confusion or to cause mistake...." The Second Circuit has said that the statute is violated when there is a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

It has been said that the issue of likelihood of confusion "is like a tangle of underbrush," but that "a path has been hewn through this thicket." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir. 1987). Judge Friendly's opinion in *Polaroid, Inc. v. Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82

S.Ct. 36, 7 L.Ed.2d 25 (1961), leads us along this path.

If any confusion exists in this case at this time, it can only benefit the plaintiff because of the demonstrated success of defendants' ventures. However, it is plaintiff's concern that in the future, Comstock Partners, Inc. may be as drastically wrong in their long-term financial advice as it has been right in the past. If this happens, it is plaintiff's contention that it will be adversely affected in its business. Plaintiff's position is that it should have control over its destiny, without regard to the perception that the consuming public might have of Comstock Partners, Inc.

This brings us, then, to the analysis called for by *Polaroid, supra.*

## III

■ The central inquiry in a trade mark infringement case is whether there is "any likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. supra.*

There are eight factors to be considered in determining likelihood of confusion.

### (1) *Strength of the Mark*

■ The strength of a mark is defined as "its tendency to identify the goods sold under the mark as emanating from a particular source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). In assessing the strength of a mark, courts generally categorize trademarks, in ascending order of distinctiveness, as "generic, descriptive, suggestive or arbitrary." *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1005 (2d Cir.1983). However, a mark's category is not alone controlling. *Id.*

Although the "ComStock mark" is suggestive, I find it to be a relatively weak mark. The ComStock telecommunications network serves simply as a delivery vehicle for "real time" data ticket service generated by others, such as prices and quotes from the exchange floors. In addition, there are the services added by plaintiff in late 1989 after the institution of this lawsuit, such as Dow Jones and Standard & Poor's Market Scope. However, all these services, as plaintiff itself concedes, are not available exclusively on ComStock. Subscribers who receive these services through the ComStock network can just as easily glean such information through other "real time" networks or through a printed medium, and thus are highly unlikely to associate the information they receive with the particular vehicle transmitting it. Can it possibly be plaintiff's intention to transfer Standard & Poor's name and goodwill to Comstock?

Furthermore, to the extent that plaintiff has increased ComStock's name recognition by expanding its network since 1989, and spending some $700,000 in 1989 for advertising, it is clear that such expansion took place well after defendants achieved notoriety in the financial community in 1987 as a result of the stock market crash. It is interesting to note that despite plaintiff's claim of increased name recognition, its own market survey conducted at the end of 1989 showed that only 12 out of 285 registered representatives associated ComStock with data service, and only 2 out of 105 investors interviewed made the connection. Furthermore, 74 of the 285 registered representatives, employees of brokerage houses, correctly identified the defendants and their business.

Finally, if one looks in the Westchester telephone directory, the first listing under Comstock is "Comstock 670 Wht Plns Rd Scrsdl," which is plaintiff's business. The third listing is "Comstock Communications Inc. Rte 22 Brewster." If a person was interested in ComStock service, how easy to call the third listing. Therefore, I cannot conclude that the relevant public has come to associate the term "ComStock" with plaintiff.

### (2) *Similarity of the Marks*

■ I find that the marks used by plaintiff and the defendants differ substantially in both substance and context. The mark "ComStock" is occasionally used alone in

plaintiff's advertisements. When the word "ComStock" is used in publicity brochures and newsletters, it is almost invariably coupled with the subtitle "Innovations in Real Time Market Quotations."

By contrast, defendants do not advertise their services, and do not use the word ComStock alone or apart from their trade names or the full names of their newsletters. Media references usually start with Comstock Partners, Inc., although thereafter the writer may shortcut to Comstock. Defendants refer to themselves as "Comstock Partners, Inc.," "Comstock One L.P." and "Comstock Partners Strategy Fund, Inc." The Comstock Partners, Inc. newsletter is entitled "Comstock Investment Strategy Commentary" or "Review," and costs $7,200 per subscription to about 150 people.

In view of the divergent manner in which the parties' names and marks are presented to the public, and the differing context in which they are disseminated, I conclude that the names and marks are not sufficiently similar so as to provoke confusion. *See Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 157–58 (S.D.N.Y.1980).

### (3) *Competitive Proximity*

■ This is an area where plaintiff completely fails to sustain its burden of proof. ComStock and the defendants, while they furnish products related to the broad field of finance, are as completely unrelated as night and day.

ComStock is in the business of leasing access time to a computer data base. Defendants are money managers for multimillion dollar operations. Comstock Partners Strategy Fund, Inc., a closed end mutual investment fund of over $1 billion, is not remotely similar to the ComStock product line. Nor is the defendant Comstock One L.P., a limited partnership of some 15 millionaire investors who leave investment decisions to defendant Comstock Partners, Inc. Even with the intended increase in the type of service to be made available to ComStock subscribers, the huge gap still exists.

Comstock Partners, Inc. gives advice in analytical papers issued monthly or quarterly to about 150 subscribers, who pay $7,200 for the service. Persons who make this sort of investment are sophisticated enough to know the source of the respective product lines. If they subscribe to Standard & Poor's services, they know the source, and it certainly is not ComStock. Can anyone imagine a broker, who sees a Dow Jones or a Standard & Poor's noontime report carried by ComStock telling a colleague over lunch that the information he learned from the report emanated from ComStock?

The other side of this coin is the attitude of the originator of the material. The acceptance of that material depends on knowing its source. Neither Dow Jones nor Standard & Poor's would use ComStock's network if its identity with the information was to be lost. ComStock's sales pitch to its subscribers is the availability of Dow Jones and Standard & Poor's as part of its "menu." The enhancement of ComStock's business with the availability of Standard & Poor's product lines was one of the reasons for the acquisition of CQI by plaintiff.

### (4) *Bridging the Gap*

■ The fourth factor "looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Centaur Communications v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987). This factor considers (i) the probability, or (ii) the public perception that an entity engaged in one type of service may begin or has begun to deal in a second service. *See Lambda Electronics Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 926 (S.D.N.Y.1981).

Plaintiff argues that its purpose in acquiring CQI, and its plan since the acquisition, has been to make the ComStock network a diversified supplier of a broad range of business information, as well as stock and commodity price quotes. Therefore, it argues that as the breadth of services it offers increases, so does the likelihood that relevant consumers will assume

a connection between plaintiff and defendants.

I disagree. As discussed above, plaintiff is and has always been merely a conduit for business information. It creates nothing insofar as the information it transmits is concerned. It has never rendered financial advice or managed investment portfolios, as has defendant Comstock Partners, Inc. The services into which plaintiff has indicated an interest in expansion are not remotely related to the type of services offered by defendants. Defendant Comstock One L.P. has a selected membership. The subscribers to Comstock Partners, Inc. are a small group of wealthy investors and money managers of huge funds. Of course, plaintiff does not intend to manage a mutual closed end investment company.

Moreover, the trademark registration certificate issued in 1985 to CQI for "ComStock" covers "leasing access time to a computer data base in the field of stock and commodity trade quotation information." Under such circumstances, plaintiff cannot rely on its trademark registration to enter into an unrelated field now occupied by defendants and preempt the latter from continuing the use of "Comstock." *See Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y.1987) (presumption of an exclusive right to use a registered trademark "extends only so far as the goods or services noted in the registration certificate"); *Information Clearing House,* 492 F.Supp. at 159 (mere fact that plaintiff has registered trademark for a specific service "does not by itself grant it a preemptive right to the mark for unrelated and noncompetitive services").

### (5) *Confusion*

■ The testimony offered by plaintiff to show actual confusion does not satisfy plaintiff's burden of proof that actual confusion has been shown by a preponderance of the evidence.

The telephone call to ComStock by Mr. Wismonsky, who was looking for Comstock Partners, Inc., does not show confusion. It reflects a mistake made by the information operator of the telephone company, who gave Wismonsky the wrong number to call in response to his request for the number for Comstock Partners, Inc.

The same sort of mistake must have been made by the secretary in the mailing of the Financial World. She was mailing material to Comstock Partners, Inc., and if she had looked up the address properly, there would have been no misdirection. This does not show confusion.

Finally, the examples involving Baer Stearns and Drexel Burnham, the two brokerage houses, do not indicate confusion. Rather, they indicate knowledge of the true situation, and request for clarification as to which service was being referred to.

However, the Lanham Act only requires "likelihood of confusion," and plaintiff has submitted the testimony and survey findings of a marketing expert on this issue.

Two groups or "universe" of persons were surveyed-registered representatives and investors. The finding is that only a very small percentage of the persons surveyed ever heard of ComStock or Comstock Partners, Inc. Only 55, or 20 per cent of the 283 registered representatives knew specifically of Comstock Partners, Inc., and only 8 of these indicates likelihood of confusion. As for the investors, practically none of the 105 interviewed had heard of either service.

With so few persons knowing of either service, the question of confusion is highly speculative, and the question asked to ascertain the fact should have been carefully crafted. However, the description given of ComStock in the survey does not give the interviewee any real idea of what it does. That person does not know that ComStock merely transmits material from other sources, such as Dow Jones, or Standard & Poor's, or New York Stock Exchange quotations. Furthermore, this survey was conducted by telephone and lasted only a few minutes. Asking unsuspecting interviewees under these circumstances whether they thought that ComStock and Comstock Partners, Inc. are likely to be connected or affiliated would lead to "off the top of the head" affirmative answers.

Finally, no universe was selected that would reflect the views of persons who would avail themselves of defendants' services.

### (6) *Junior User's Good Faith in Adopting the Mark*

 While it is true that defendant Comstock Partners, Inc. would have learned of ComStock's trademark if a search had been made, failure to do so has little impact on the facts of this case. The object of the three men was to become money managers. A search would have informed them that ComStock was in the business of "leasing access time to a computer data base in the field of stock and commodity trade quotation information."

On the other hand, CQI had a search made by a private concern, and it showed several users of similar names in the financial area. This did not cause any problem for it. In fact, the report indicates Comstock's goods as "communication Network (Finances and Sports information)." I call attention to the remarks above about the third listing in the Westchester telephone directory.

### (7) *Quality of Defendants' Product*

 The high quality of defendants' services in predicting financial trends is undisputed by plaintiff. Plaintiff argues, however, that if defendants' good fortune runs out, and their highly publicized predictions turn out to be dramatically wrong, the negative publicity that envelops Comstock Partners, Inc. will likely be extensive and will hurt plaintiff's reputation.

This is an interesting argument from ComStock which has no track record in the product lines of defendants, and, as pointed out several times in this opinion, never will create such a track record because it simply is a data transmission service.

### (8) *Sophistication of Consumers*

 The type of consumer who would be presented with any problem of confusion in this case appears to be one who is responsible for the investment of large sums of money either for himself or for other persons. "The greater the value of an article, the more careful the typical consumer can be expected to be; ..." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1978).

In weighing sophistication as an element in likelihood of confusion cases, we must also bear in mind that the services "are sufficiently related that customers are likely to confuse the source of origin." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976).

Consumers who purchase stock in a closed end investment fund called Comstock Partners Strategy Fund, Inc., with over $1 billion in assets, will not be persons who in the main subscribe to ComStock services. Purchasing stock in the fund is no different from purchasing stock in AT & T or General Motors. If such purchasers have heard of ComStock, their sophistication would be such that they would know the stock they are buying is not related to ComStock.

Similarly, the sophistication of persons who may become limited partners in Comstock One L.P., with a minimum participation today of $50 million apiece, certainly would know the difference between the parties.

Finally, the limited appeal of Comstock Partners, Inc., because of its attendant cost and approach, would call for a sophistication that would prevent such a consumer from thinking that ComStock is the source of Comstock Partners, Inc.

### IV

Plaintiff has not established by a preponderance of the evidence that its trademark has been infringed by any of the defendants. The intended use by plaintiff of the trademark is in conjunction with an electronic transmittal service of a wide variety of financial information services. The suppliers of the information services are clearly defined and no one reading any material supplied over the network by Standard & Poor's would believe that the material was that of ComStock. And no one who might become a client of Comstock Partners, Inc.

would believe that the source of the advice was ComStock. Nor would any customer or potential customer of ComStock be confused to the point of believing that its source was Comstock Partners, Inc.

As has already been noted, the purchaser of stock in the closed end mutual fund has absolutely no reason to think that ComStock is the corporation in which he is buying stock.

Any investor who might have enough money to become a limited partner in Comstock One L.P. could not possibly think that his investment has anything to do with ComStock, or if he ever contemplates subscribing to ComStock, that its ownership was in the hands of Comstock One L.P.

Requests for attorneys' fees in the event of success in this litigation has been requested by counsel for plaintiff and the defendants. The disposition of the case precludes any award to counsel for the plaintiff. Defendants' counsel have not shown that this is an exceptional case justifying an award to them. 15 U.S.C. § 1117.

The complaint is dismissed, and judgment shall be entered in favor of the defendants.

So Ordered.