**Thomas M. MURPHY d/b/a Thomas M. Murphy & Associates, Plaintiff–Appellant,**

v.

**PROVIDENT MUTUAL LIFE INSURANCE COMPANY OF PHILADELPHIA, and AIMS, Inc., Defendants–Appellees,**

**and**

**Harleysville Insurance Companies, Intervening–Appellees.**

**No. 169, Docket 90–7335.**

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1990.

Decided Dec. 21, 1990.

As Amended Jan. 22, 1991.

---

Stephen M. Trattner, Washington, D.C. (Lewis & Trattner, Washington, D.C., Michael P. Foley, Jr., Blazzard, Grodd & Hasenauer, Westport, Conn., of counsel), for plaintiff-appellant.

Barry Kramer, Southport, Conn. (Gerald E. Linden, Kramer, Brufsky & Cifelli, Southport, Conn., of counsel), for defendant-appellee Provident Mut. Life Ins. Co. of Philadelphia.

Barry L. Kelmachter, New Haven, Conn. (Bachman & LaPointe, New Haven, Conn., of counsel), for intervening-appellees.

Before FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Thomas M. Murphy appeals from a summary judgment of the United States District Court for the District of Connecticut (Eginton, J.) dismissing Murphy's service-mark infringement and unfair competition claims. We affirm.

In recent years, insurance brokers and third party administrators (TPAs) have strongly favored the use of the word "hot" in their advertisements. The following scattered examples are typical:

What's RED HOT about cafeteria plans; WE MATCH HOT IDEAS WITH HOT PRODUCTS; A HOT NEW TEAM IN TOWN; NOW! The 'Hot' Products in Small Group; 3 Hot UL's; Newest, Hottest Plan in the Market; Color this plan RED HOT; HOT NEW YEAR SPECIAL; Hot New Annuity Product; A new HOT term product; It's Hot; Hot Stuff; WHY IT'S SO HOT; The Hottest Sale in Life Insurance; Your hot line; THE HOTTEST SPWL AROUND; The Hottest Income Generators.

Not surprisingly, many of the advertisements in which these words were used contained symbols that expressed the concept of heat, such as flames, burning matches, torches, and fire spouting dragons.

Murphy, a TPA who marketed and administered small group insurance plans to brokers and agents, went along with the crowd. In January 1986 Murphy began to administer a stand-alone dental health insurance plan that he created, called "Employers Dental Trust". During 1986, Murphy's advertisement described Employers Dental Trust as "the hottest dental plan in the insurance industry." While other advertisements used burning matches, torches, etc. to carry out the concept of hot sales, Murphy's used a steaming coffee cup. In late 1986 Murphy changed his advertisement by describing his plan as "the hottest dental plan under the sun" and substituting a bursting thermometer for

the coffee cup. This advertisement appeared in the January and February 1987 issues of *Life Association News*, an insurance industry trade publication. Murphy maintains that he continued to use the thermometer graphic in direct mailings and personal presentations to brokers and agents until June 1987. Murphy did not register the thermometer symbol as a trademark or servicemark, and his advertisement did not contain a copyright, trademark, or servicemark notice. Indeed, the bursting thermometer idea was not unique with Murphy. Other advertisements, in and out of the insurance industry, used it when the concept of hot sales was being pushed. For example, a June 30, 1987 advertisement of *Insurance Times*, an insurance industry weekly newspaper, contained a bursting thermometer and the words "the hotter it gets, the better we like it."

AIMS, Inc., also a TPA, began in early 1987 to administer a stand-alone medical health plan called "Plan USA" that was underwritten by Provident Mutual Life Insurance Company of Philadelphia. AIMS created an advertisement for Plan USA that included the words "Brand New and Red Hot" and contained a bursting thermometer identical to the one in Murphy's advertisement. AIMS's advertisement for Plan USA appeared in the June and July 1987 issues of *Broker World*, another insurance industry trade publication. AIMS did not publish it thereafter. Murphy returned briefly to his thermometer advertisement with insertions in two July 1987 trade publications and the August 1987 issue of *Financial Times*. Beginning in September 1987, Murphy changed the theme of his advertising from hot sales to boosted sales and replaced the thermometer with a man on a rocket. In May 1988 he changed again, this time to the theme of rising sales, with a man in a balloon replacing the man on a rocket.

Murphy brought this action in April 1988, claiming servicemark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition under Connecticut law. Defendants-appellees moved for summary judgment, and the district court referred the case to Magistrate Thomas P. Smith. In a well-reasoned opinion, Smith held that Murphy had no right of recovery under either federal or state law. Following *de novo* review, the district court adopted and affirmed the magistrate's opinion.

After the magistrate filed his opinion, chapter 7 bankruptcy proceedings were commenced against AIMS, and the bankruptcy court stayed further proceedings in this action against AIMS. As a result of AIMS's bankruptcy, Harleysville Insurance Companies, which were obligated under insurance policies held by AIMS to pay the cost of its defense, intervened in this action in order to protect their interest in securing reimbursement of attorneys' fees and costs expended in providing AIMS with a defense.

Murphy's claim is based primarily on the similarity between the use of the words "hot" and "hottest" and the identity in appearance of the thermometers. However, similarity, even identity, is not enough if Murphy had no interest in the words and the graphic that entitled him to restrict their use. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987); *American Television & Communications Corp. v. American Communications & Television, Inc.*, 810 F.2d 1546, 1548 (11th Cir.1987). In Murphy's complaint, he alleged the existence of such proprietary interest by asserting that he owned a protectable servicemark in his "hot campaign and his thermometer." The court below correctly held that he had neither.

■ In brief, a servicemark is a word, name, or symbol used to identify and distinguish the services of one person from the services of others. *See West & Co. v. Arica Institute, Inc.*, 557 F.2d 338, 340 n. 1 (2d Cir.1977); 15 U.S.C. § 1127. Our first task, therefore, is to identify the "services" whose source Murphy is seeking to identify. Since the Lanham Act does not define the term, we may look to prior judicial decisions for help. Clearly, the term does not apply to goods or products. *Application of Radio Corp. of America*, 40 C.C.

P.A. 1025, 205 F.2d 180, 182 (1953). More-over, it does not apply to services that are solely for the benefit of the performer; the services must be rendered to others. *In re Dr Pepper Co.*, 836 F.2d 508, 509 (Fed.Cir. 1987); *In re Advertising & Marketing Development, Inc.*, 821 F.2d 614, 619 (Fed.Cir. 1987). Assuming that Murphy's sale of his insurance expertise to others may be treated as a service under the Act, the advertising of this service, as distinguished from its performance, may not. *See In re Dr Pepper, supra*, 836 F.2d at 509–12; *Application of Orion Research, Inc.*, 523 F.2d 1398, 1399–1400 (C.C.P.A.1975); *see also Häagen–Dazs, Inc. v. Frusen Glädjé, Ltd.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980). In short, the theme of Murphy's advertising campaign is not a service for which a servicemark could be claimed. It follows that, if Murphy was selling insurance, a product, rather than his expertise in the field, he performed no services that a servicemark might be said to identify.

■ Murphy contends, of course, that he was selling services rather than a product. Defendants contend, on the other hand, that he was selling a product, an insurance plan or program. They point to statements in Murphy's complaint and depositions, and in the advertisement itself, that so state. The magistrate observed that, although Murphy's complaint described his claimed mark as a servicemark, Murphy used the terms servicemark and trademark interchangeably in his legal memoranda. It is not surprising, therefore, that the magistrate couched much of his discussion in trademark terms. Indeed, under the facts of this case, it makes little difference whether Murphy is claiming a trademark or a servicemark. A servicemark differs from a trademark only in that a servicemark identifies services rather than goods. *West & Co., supra*, 557 F.2d at 340 n. 1; Evans, *A Primer on Trademarks and Service Marks*, 18 St. Mary's L.J. 137, 139 (1986). Whether a mark is one or the other, the standards for determining infringement are essentially the same. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200,

203 n. 3 (2d Cir.1979); *West & Co., supra*, 557 F.2d at 340 n. 1.

■ As pointed out above, during the time at issue herein the insurance brokerage industry was committed to the "hot" theme in its advertising. Both the words and the graphics in the advertisements were intended to convey the idea of "hot" sales in a new and specialized area of business. The thermometer in Murphy's advertisement was no exception; it was intended to exemplify this quality or characteristic of his insurance plan or program. The magistrate correctly concluded, therefore, that, if the thermometer graphic in Murphy's advertisement was a mark at all, it was a descriptive mark. Marks that are laudatory and that describe the alleged qualities or characteristics of a product or service are descriptive marks. *See Centaur Communications, supra*, 830 F.2d at 1220; *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 747 F.2d 81, 87–88 (2d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). Indeed, the notion of a "hot" product is a common marketing technique. If Ford Motor Company advertised its cars as "hot" and used a thermometer in the advertisements, would the thermometer be protected absent a showing of secondary meaning? We think not. Murphy used the thermometer in this manner, to advertise "the hottest dental plan under the sun." The magistrate thus properly found that Murphy could prevail only if he established that the mark had acquired secondary meaning and that there was a likelihood of confusion as to the source of the insurance plans represented in the advertisement. *See Centaur Communications, supra*, 830 F.2d at 1221. This conclusion finds support in our circuit in decisions holding that non-verbal marks that are unregistered always require proof of secondary meaning. *See Union Mfg. Co. v. Han Baek Trading Co.*, 763 F.2d 42, 48 (2d Cir.1985); *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304 (2d Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982).

■ A mark acquires secondary meaning when its primary significance in

928

the minds of the consuming public is the producer rather than the product, *i.e.*, the public must associate the product with a particular source. *Centaur Communications, supra*, 830 F.2d at 1221. Although we have suggested a number of factors that may be weighed in determining the existence of secondary meaning, *see Centaur Communications, supra*, 830 F.2d at 1222, we realize that the existence of secondary meaning and likelihood of confusion are not to be determined by application of a rigid formula, *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986). "[N]o precise guidelines are applicable and no single factor is determinative." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). The crucial question is whether the public is moved to buy a product because of its source. *Id.* "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982); *see LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1059 (2d Cir.1979).

 The usual standard of review of a district court's finding on this issue of secondary meaning is whether it is clearly erroneous. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1133 n. 4 (2d Cir.1979). Similarly, the district court's determinations of the factors used to determine likelihood of confusion as set out in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), are subject to the clearly erroneous standard, although the ultimate determination of likelihood of confusion based on these findings of fact is a legal conclusion reviewable *de novo*. *See Centaur Communications, supra*, 830 F.2d at 1225. We are aware that the appeal comes to us from a grant of summary judgment so that there

were no evidentiary findings in the usual sense made by the magistrate or by the district court, and we must review the record to see if there are "genuine issues" regarding material facts, drawing all reasonable inferences in favor of the non-moving party.

 The magistrate referred specifically to the several factors we identified as useful in *Centaur Communications, supra*, 830 F.2d at 1222, and *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985). He found that no consumer studies had been undertaken and that no unsolicited media coverage had occurred. He found no evidence of expenditures that were related solely to Murphy's thermometer advertisement. He found also that the thermometer had not been used for a sufficient period of time to become associated in the minds of the public with Murphy. He found that Murphy had not come forward with any probative evidence of a likelihood of confusion. Murphy argues that he had provided evidence of actual confusion with the affidavits of three insurance executives in which they state that they associated the thermometer graphic with Murphy and were initially confused when they saw the AIMS advertisement, thinking that Murphy had created it. However, to be relevant, Murphy's evidence of confusion must address the issue of whether the allegedly infringing advertisement created confusion as to the source of the insurance plans depicted in the advertisement. The three insurance executives stated that they were not confused as to the source of the plan. We agree with the magistrate's view that Murphy had not provided sufficient probative evidence to allow a jury to conclude that there was a likelihood of confusion.

Citing *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir.1972), the magistrate said, "There is hardly likelihood of confusion, in any event, where, as here, the names of the products and the plan administrators are clearly indicated." Indeed, without any findings by the court below, it is obvious to us from our own examination of defendants-appellees' adver-

tisement that it cannot reasonably be said to have created confusion as to the source of the services or products in question. It clearly indicated the name of the medical plan, "Plan USA", and its originating source, AIMS, as administrator, and Provident Mutual, as insurer. *Cf. Filmways Pictures, Inc. v. Marks Polarized Corp.*, 552 F.Supp. 863, 867 (S.D.N.Y.1982).

■■■■ Although Murphy's complaint contained no reference to trade dress, he argues that he gained trade dress rights in his advertisement containing the thermometer graphic. Defendants-appellees contend that this issue is not properly before this court because it was neither alleged nor argued below. The reason for such omission is quite obvious. Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, or graphics. *Stormy Clime, Ltd. v. Progroup, Inc.*, 809 F.2d 971, 974 (2d Cir.1987). Murphy contends that his mark was a servicemark, a mark that concededly played no role in the performance of the services. Neither the word "hot" nor the thermometer was incorporated in or made a part of the plans or programs that Murphy produced. Although in a proper case a particular sales technique might be treated as part of a product's trade dress, *see John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983), the contents of Murphy's advertisements, standing alone, cannot be considered as trade dress for his services. Under the circumstances, the court below did not err in failing to adopt the concept of trade dress.

Murphy's suggestion that, unlike the Eighth Circuit in *Black & Decker Mfg. Co. v. Ever–Ready Appliance Mfg. Co.*, 684 F.2d 546 (8th Cir.1982), we adopt the doctrine of "secondary meaning in the making" is equally without merit. If this court ever decides to adopt the concept of secondary meaning in the making, a decision that the Federal Circuit believes we are unlikely to make, *see Cicena, Ltd. v. Columbia Telecommunications Group*, 900 F.2d 1546, 1548–50 (Fed.Cir.1990), this is not the case in which to do it. Group insurance plans and programs do not remain "new" and "hot" for very long, as is evidenced by the fact that Murphy changed his advertisement four times in three years. If the doctrine of secondary meaning in the making were to be applied in this case, it conceivably could be applied every time Murphy changed his advertisement. *Cf. PAF S.r.l. v. Lisa Lighting Co.*, 712 F.Supp. 394, 407 (S.D.N.Y.1989).

■■■■ Murphy's final contention is that Connecticut's unfair competition law prevents defendants-appellees from using Murphy's thermometer graphic. The parties have treated this claim as arising under the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat.Ann. § 42–110a to 110q (West 1987 & Supp.1990) (CUTPA). Section 42–110b(a) of CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice violates CUTPA, Connecticut courts examine the following three criteria: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ]." *Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57 (1987) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 8, 92 S.Ct. 898, 905–06, 31 L.Ed.2d 170 (1972)).

■■■■ A violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. *Web Press, supra*, 203 Conn. at 355, 525 A.2d 57. Murphy has not provided any evidence that anyone was deceived by defendants-appellees' use of the thermometer graphic. No deception can exist where, as here, the parties' advertisements clearly indicate the

names of the respective plans as well as the plan administrators' names. Additionally, Murphy's claims do not indicate a public policy violation. Because the thermometer graphic did not attain servicemark status, the graphic was left in the public domain. Absent some legally defined exclusive right, the law permits and encourages imitation and copying of marks that are in the public domain. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231–32, 84 S.Ct. 784, 781–82, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 237–38, 84 S.Ct. 779, 781–82, 11 L.Ed.2d 669 (1964); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980). We agree with the court below that the record does not disclose a violation of Connecticut law.

In sum, we believe that this case was decided correctly in the court below and we affirm.

KEARSE, Circuit Judge, dissenting:

While I would perhaps have little difficulty upholding the judgment dismissing the complaint if it had been entered after a trial, I must respectfully dissent from the decision to affirm the dismissal on summary judgment.

Though at a trial there would be factual issues as to, *inter alia*, credibility, likelihood of confusion, and damages, this case was decided on the motion of defendants AIMS, Inc. ("AIMS"), *et al.*, for summary judgment. On such a motion, the record should have been viewed in the light most favorable to plaintiff Thomas M. Murphy as the nonmoving party. *See, e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment. *See, e.g., Frito–Lay, Inc. v. Morton Foods, Inc.*, 316 F.2d 298, 301 (10th Cir.1963) (court cannot properly grant summary judgment on ground that weight of evidence negates likelihood of confusion).

Taken in the light most favorable to Murphy, the record in the present case shows, *inter alia*, that in January 1987, Murphy began using a bursting-thermometer mark in his national advertisements; that his sales increased dramatically after he began using this graphic; and that AIMS knowingly and intentionally copied Murphy's bursting thermometer, see Exhibit A hereto, for its own ads, see Exhibit B hereto. When other insurance industry executives, according to two affidavits submitted in the district court, first saw AIMS's bursting-thermometer ad, they immediately believed it to be a Murphy ad. After being informed of this and being advised (a) that the identical appearance of the two graphics was confusing, and (b) that others in the industry would probably assume that it was Murphy who had copied from his larger competitor, and not the other way around, Murphy ceased using his own bursting-thermometer mark.

I have several points of disagreement with the majority. First, the majority holds that Murphy cannot prevail in his present suit unless he can show that his bursting-thermometer mark had acquired secondary meaning. The premise for this ruling is that the term "hot" is a descriptive term, not an arbitrary one. In the present context, *i.e.*, dental benefits plans, this premise is questionable. An exploding thermometer is not descriptive of a dental insurance plan. Neither the insurance plan nor the service that would administer it has any temperature. The term "hot" is used to suggest that the plan would be highly desirable and salable. Even if that term be deemed a descriptive opinion of salability, the use of the bursting thermometer as a graphic means of communicating that opinion was merely suggestive not descriptive, *see, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976) (discussing various degrees of Lanham Act protection accorded depending on whether term is "generic," "descriptive," "suggestive," or "arbitrary or fanciful"), and the overall thrust of the bursting-thermometer mark in connection with a dental benefits plan was surely arbitrary or fanciful.

Second, assuming that Murphy was required to show secondary meaning, the record below precludes a ruling that his bursting-thermometer mark had no such meaning as a matter of law. Three industry executives submitted affidavits stating that they had associated the bursting-thermometer mark with Murphy. At least two of them immediately mistook the AIMS ad for that of Murphy. Actual confusion is strong evidence of secondary meaning. *See, e.g.,* 1 J. McCarthy, *Trademarks and Unfair Competition* § 15:12, at 688 (2d ed. 1984) ("McCarthy"). Further, AIMS concedes, as it must (compare Exhibits A and B hereto), that the marks used in the two ads are identical; and the record shows that, during the period in which AIMS was developing its own ad, an AIMS employee had clipped Murphy's ad out of the *Life Association News* and had given it to the person in charge of designing AIMS's ad. "Evidence that defendant knowingly imitated or copied plaintiff's symbol has long been regarded as probative of likely customer confusion. Thus, such evidence is also probative of the existence of secondary meaning." McCarthy § 15.12, at 688 (footnote omitted).

Finally, the majority seems to believe that as a matter of law there was no likelihood of confusion because AIMS's name appeared on its own ad. The mere fact, however, that the junior user's name is included in the similar material does not as a matter of law eliminate the likelihood of confusion. *See, e.g., Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988). I think it plain that the record in this case contained evidence sufficient at least to create a genuine issue of fact as to the likelihood of confusion. As indicated above, there is evidence of copying, and copying is probative of likelihood of confusion. *See* McCarthy § 15.12, at 688. Further, two industry executives submitted affidavits stating that when they saw the AIMS copy they immediately thought it was a Murphy ad. Indeed, an AIMS employee at his deposition initially mistook the Murphy ad for the AIMS ad. This evidence of actual confusion is strong evidence of likelihood of confusion. *See, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir.1987); *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir. 1971) ("There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.... [V]ery little proof of actual confusion would be necessary to prove the likelihood of confusion."). Though the executives who presented affidavits here took a close second look at the AIMS ad and were sufficiently knowledgeable to be aware that AIMS and Murphy had no connection, I do not think it inferable as a matter of law that every person who saw the ad would be similarly knowledgeable. A reader might assume, erroneously, that, given use of the identical marks, if he called AIMS he would be dealing with Murphy.

The majority concludes that because the careful and knowledgeable executives who submitted affidavits here were not ultimately confused, the evidence of their immediate confusion was not "probative." I regard the majority's conclusion as one that does not draw all permissible inferences in favor of the party opposing summary judgment and as one that invades the province of the jury.

In sum, taking the evidence in the light most favorable to Murphy, the Murphy mark had industry recognition, and the AIMS ad that was copied from it created confusion as to the source of the services offered. In these circumstances, I believe the granting of summary judgment was improper. I would vacate the judgment and remand the matter for trial.

932

EXHIBIT A

Employers
Dental
Trust

*...the hottest dental plan
under the sun*

Employers Dental Trust is a proven business booster for today's agents and brokers. It rewards your sales efforts with top commissions and opens the door to other new business for you.

Employers Dental Trust is underwritten and fully insured by Connecticut General Life Insurance Company. Check these sales-winning features which you may not find in other dental plans.

- *Available to groups with 3-49 employees.*
- *Stand alone plan—can be sold separately from other coverages.*
- *Two reasonable and customary Comprehensive Dental Plans with high calendar year maximums.*
- *Choice of any licensed dentist*
- *Direct claim system includes an I.D. card, toll free number and a personal claims examiner.*
- *One year rate guarantee from the client's effective date.*
- *Orthodontia option available on both plans.*

If you want to collect *extra* commissions and add new clients, call Joe Sherman right now. Or send for your new sales kit which includes our "Instant Quote."

**EDT**

## EMPLOYERS DENTAL TRUST

P.O. Box 844 680 Kings Highway East, Fairfield, CT 06430
1-800-243-2534 • In CT (203) 336-2506

LAN 2 57

*Another Plan Exclusively Administered By
Thomas M Murphy & Associates*

EXHIBIT B

**BRAND NEW & RED HOT!**

**PROVIDENT MUTUAL PLAN U·S·A**

Introducing PLAN USA — the brand new and red hot group medical plan that's causing quite a stir in the brokerage community! This new plan, for groups of 2 - 14 employees, is insured by Provident Mutual Life Insurance Company (Rated A+ [Superior]:XV by A.M. Best) and features a true 100% plan. (Insured pays a deductible — Choice of $125 or $250 and PLAN USA pays 100% of the balance of covered medical expenses.)

Once you see the sales winning features, we're sure you'll agree — PLAN USA sizzles. Its great benefits and competitive rates will leave the competition smoldering!

Write or phone for your Plan USA Sales Kit and do it today!

**PLAN USA — IT'S RED HOT!**

FULLY INSURED BY

PROVIDENT MUTUAL
A.M BEST RATED A+
PHILADELPHIA, PENNSYLVANIA

AVAILABLE ONLY THROUGH

**AIMS**

7996 North Point Blvd /P U Box 11107
Winston-Salem North Carolina 27116-9984
Phone 1-800-USA AIMS

DISTRIBUTOR CONTRACTS AVAILABLE

**CALL**

**1-800-USA-AIMS**

TEAR ALONG DOTTED LINE

☐ YES! RUSH MY PLAN USA SALES KIT TODA

NAME _____

ADDRESS _____

_____

PHONE: _____

Complete and return to AIMS. P O Box 11107 Winstor
Salem. NC 27116-9984