NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1017
_____

ENGAGE HEALTHCARE COMMUNICATIONS, L.L.C.;
GREENHILL HEALTHCARE COMMUNICATIONS, L.L.C.;
CENTER OF EXCELLENCE MEDIA, L.L.C.,

Appellants

v.

INTELLISPHERE, L.L.C.;
MICHEL J. HENNESSY & ASSOCIATES, INC.;
MICHAEL J. HENNESSY; ARC MESA EDUCATORS, L.L.C.;
JOHN DOES 1-5; JANE DOES 1-5
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 3-12-cv-00787)
District Judge: Honorable Freda L. Wolfson
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 25, 2019

BEFORE: GREENAWAY, JR., PORTER, and GREENBERG, Circuit Judges.

(Filed: November 20, 2019)
_____

OPINION*
_____

_____

*This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.    INTRODUCTION

In this this trademark infringement action between strikingly similar companies separately owned by two brothers, we are asked to review the District Court's opinion and judgment adjudicating the infringement dispute between them.  That Court granted summary judgment to defendants, finding that they did not infringe the alleged trademarks owned by plaintiffs.  For the reasons stated below, we will affirm the judgment.

## II.    FACTUAL BACKGROUND

We rely on the facts the District Court recited in its excellent comprehensive opinion which we therefore do not repeat at length.  <u>See</u> <u>Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC</u>, No. 12-0787, slip op. at 2-12 (D.N.J. Nov. 29, 2018).  At its core, this is a straightforward trademark dispute.  The District Court helpfully summarized the marks at issue with two tables in its opinion.  They are as follows:

| **Plaintiffs' Marks** | **Defendants' Marks** |
|---|---|
| PERSONALIZED MEDICINE IN ONCOLOGY<br><br>PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY | PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY |
| THE ONCOLOGY NURSE<br><br>THE ONCOLOGY NURSE APN/PA | ONCNURSE |

2

| Plaintiffs' Marks | Defendants' Marks |
|---|---|
| VALUE-BASED CANCER CARE<br><br>VALUE-BASED ONCOLOGY CARE | VALUE-BASED ONCOLOGY |
| ONCOLOGY PHARMACY NEWS<br><br>CLINICAL ONCOLOGY PHARMACY NEWS | ONCOLOGY PHARMACY NEWS |
| ONCOLOGY PRACTICE MANAGEMENT | ONCOLOGY BUSINESS MANAGEMENT |
| AMERICAN HEALTH & DRUG BENEFITS | AMERICAN JOURNAL OF PHARMACY BENEFITS |
| PEER-SPECTIVES | PEERS & PERSPECTIVES |
| TARGETED THERAPIES IN HEMATOLOGY/ONCOLOGY<br><br>TARGETED THERAPIES IN ONCOLOGY<br><br>TARGETED THERAPIES IN BREAST CANCER<br><br>TARGETED THERAPIES IN LUNG CANCER<br><br>TARGETED THERAPIES IN NONHODGKIN LYMPHOMA | INTERNATIONAL CONGRESS ON TARGETED THERAPIES IN CANCER<br><br>INTERNATIONAL JOURNAL OF TARGETED THERAPIES IN CANCER<br><br>BIOMARKERS, PATHWAYS, AND TARGETED THERAPIES<br><br>TARGETED THERAPY NEWS |

Engage, slip op. at 3-4.

| Plaintiffs' Marks | Defendants' Marks |
| --- | --- |
| JOURNAL OF PERSONALIZED MEDICINE IN HEMATOLOGY/ONCOLOGY | PERSONALIZED CANCER CARE |
| PERSONALIZED CANCER CARE | |
| PERSONALIZED MEDICINE IN IMMUNOLOGY | |
| PERSONALIZED MEDICINE IN RHEUMOTOLOGY | |
| PERSONALIZED BREAST CANCER | |
| PERSONALIZED VALUE BASED CANCER CARE | |

| Plaintiffs' Marks | Defendants' Marks |
|---|---|
| PERSONALIZED VALUE BASED CANCER CARE | VALUE -BASED CARDIOLOGY |
| VALUE-BASED BREAST CANCER | VALUE-BASED CARDIOLOGY CARE |
| VALUE-BASED CARE IN RHEUMOTOLOGY | VALUE-BASED DESIGN |
| VALUE-BASED CARE IN MULTIPLE MYELOMA | VALUSE-BASED INSURANCE DESIGN |
| VALUE-BASED ONCOLOGY BENEFIT DESIGN | |
| TRANSLATING EVIDENCE-BASED RESEARCH INTO VALUE-BASED DECISIONS | |
| INSTITUTE FOR VALUE-BASED MEDICINE | |
| CLINICAL ONCOLOGY PHARMACY | N/A |
| RHEUMATOLOGY BUSINESS MANAGEMENT | N/A |
| DERMATOLOGY BUSINESS MANAGEMENT | |
| DIABETES BUSINESS MANAGEMENT | |

Engage, slip op. at 9-10.

## III. DISCUSSION

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review of the District Court's grant of summary judgment and thus consider the issues de novo. See Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ., 880 F.3d 643, 650 (3d Cir. 2018). Accordingly, we are applying "the same standard as the District Court to determine whether summary judgment was appropriate." State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009). "[S]ummary judgment is properly granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Sconiers v. United States, 896 F.3d 595, 597 n.3 (3d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).

In granting summary judgment to defendants, the District Court held that (1) none of plaintiffs' alleged trademarks were enforceable as advertising marks, thus defendants could not have infringed them; (2) all but one of plaintiffs' trademarks were unenforceable in the online and/or print publication class in the fields of hematology and oncology that they addressed; and (3) defendants did not infringe the lone valid trademark. The District Court also held that (4) plaintiffs' state-law unfair competition claims failed because under state law, essentially the same standard applied to their unfair competition claims as their federal trademark claims; and (5) the District Court lacked subject matter jurisdiction to adjudicate plaintiffs' request for declaratory judgment to invalidate defendants' alleged trademarks. In view of the District Court's thorough treatment of the issues and our agreement with its treatment we will affirm its judgment

6

for substantially the same reasons the District Court articulated in its opinion with one exception which we discuss below. Nevertheless, our rejection of the District Court's reasoning on that issue does not change our result which affirms its judgment.

A. Advertising Marks

We agree with the District Court that plaintiffs' alleged marks could not be enforced as advertising service marks in this case which at bottom is an argument over advertising. "Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods. . . . Although technically distinct, the terms are often used interchangeably, with no significant legal consequences." Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 855 (3d Cir. 1992) (citation omitted). As such, a court addresses the question of whether a service mark is entitled to protection under the Lanham Act using the same standard that it applies when considering trademarks. Id. "In order to determine whether a mark is protectable as a trademark, marks are divided into four classifications: (1) generic (such as 'DIET CHOCOLATE FUDGE SODA'); (2) descriptive (such as 'SECURITY CENTER'); (3) suggestive (such as 'COPPERTONE'); and (4) arbitrary or fanciful (such as 'KODAK')." A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3d Cir. 2000) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S.Ct. 2753, 2758 (1992)). "In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning. . . . Generic marks receive no protection; indeed, they are not 'trademarks' at all." Id. at 222 (citations omitted).

7

The District Court cited to In re Advertising & Marketing Development, Inc., a case from the Court of Appeals for the Federal Circuit, for the proposition that advertising service marks must be sufficiently separate from the subject of the advertising, and must be used to identify advertising services, not merely to identify the subject of the advertising. 821 F.2d 614, 619-20 (Fed. Cir. 1987). We agree with the District Court's treatment of that case. After all, we have held that an advertising service mark that merely describes the subject of its advertising is a descriptive mark not entitled to service mark protection. Dranoff-Perlstein, 967 F.2d at 858; see Murphy v. Provident Mut. Life Ins. Co., 923 F.2d 923, 927 (2d Cir. 1990) ("Marks that are laudatory and that describe the alleged qualities or character of a product or service are descriptive marks." (internal citation omitted)).

We have no trouble finding, as did the District Court, that all of plaintiffs' alleged marks, when viewed as advertising service marks, are merely descriptive on their face. In contrast, they may be compared to a well-known advertising mark—"Just Do It"— from the sports apparel company Nike. That phrase is generic and does not provide any indication to a consumer that it is tied to any product, any company, or any industry, but it has become essentially a cultural icon synonymous with Nike and its products entirely through its use as an advertising slogan. It is clear that the alleged marks at issue here are qualitatively of a different character than Nike's mark.

We recognize that the District Court did not make a "secondary meaning" analysis of plaintiffs' marks to the extent they are asserted as advertising marks. See Dranoff-Perlstein, 967 F.2d at 858. However, we hardly can fault it for not having done so,

8

because there was no evidence to show that these alleged marks had achieved secondary meaning through their uses in advertising. Rather, as we will explain, they have not even achieved secondary meaning within the industry itself, let alone secondary meaning within the advertising space of that industry. Moreover, as the District Court noted, plaintiffs are attempting to assert the same marks as trademarks within their industry as well as service marks in the advertising space. That undertaking can be regarded as an admission that the service marks are merely descriptive of the subjects of their advertising, and it is almost impossible for them to achieve secondary meaning separate and apart from the allegedly trademark-bearing goods for which they purportedly advertise. Indeed, plaintiffs' alleged marks are no more enforceable as advertising service marks than the phrase "Just Buy Nike" would be for Nike. Accordingly, we will affirm the District Court's judgment on this ground.[1]

B. Trademarks

We also agree with the District Court that the alleged marks are unenforceable as trademarks within their respective classes, representing online/print publications in the fields of hematology and oncology. Again, the alleged marks are obviously descriptive

---

[1] Plaintiffs note that at least one of their alleged marks already had been placed in the United States Patent and Trademark Office's ("PTO") Trademark Electronic Search caption as an advertising service mark, which they contend necessarily raises a question of fact whether other similar marks could be recognized as advertising marks as well. Pls.' br. at 13 n.7; see App. at 425. However, as the District Court found, "[n]one of Plaintiffs' marks currently has a principal registration." Engage, slip op. at 4. A search of the PTO's online trademark database shows that the PTO on October 13, 2017, prior to the District Court's grant of summary judgment in this case cancelled the advertising service mark in question. See PTO's Trademark Electronic Search System (TESS), http://tess2.uspto.gov/, Registration No. 3927515 (accessed Sept. 16, 2019).

9

on their face, a conclusion which plaintiffs themselves do not seriously dispute—they make no substantive argument explaining why the marks are not descriptive. Instead, they focus on the argument that the District Court erred in finding the marks had not achieved secondary meaning at the time of defendants' alleged infringement. Pls.' br. at 37. Plaintiffs assert that the District Court erred because there was no definitive date in the record of when the alleged infringement of its marks began, so its holding must be in error if it could not identify a proper date as the basis of its analysis. However, as plaintiffs also correctly recognized, the operative issue is not when defendants infringed its marks, but whether the alleged marks had achieved secondary meaning at all, whether it be on the date of infringement, the date of summary judgment, or even today.

In Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc., we held that

> [s]econdary meaning exists when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services. . . . In general, it is established through extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark.

214 F.3d 432, 438 (3d Cir. 2000) (quotation and citation omitted). In Commerce National, we identified a non-exclusive list of factors which may be considered to decide if a mark has achieved secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

10

Id. (citation omitted).

The District Court essentially found plaintiffs had not established that the alleged marks achieved secondary meaning regardless of the exact date used as the date of defendants' infringement. While the District Court carefully limited its holding to the relevant time frame, it did not need to do so, because there is no evidence to show that the alleged marks have <u>ever</u> achieved secondary meaning. Although plaintiffs correctly cite to <u>Commerce National</u> as the standard for determining secondary meaning, they concede that they are only able to satisfy six factors of the eleven-factor list we enunciated:

> (1) the extent of sale and advertising utilizing Engage's trademarks; (2) length of use of Engage's trademarks; (3) exclusivity of use of Engage's trademarks; (4) copying of Engage's trademarks by Intellisphere; (5) the number and amount of sale involving Engage's trademarks; and (6) the number of consumers privy to Engage's trademarks through the use of those marks in commerce.

Pls.' br. at 42.

We recognize that so far as we are aware, we never have held that the test for secondary meaning is determined by some mechanical application of a non-exclusive eleven-factor list, nor by counting how many of the eleven factors a plaintiff can satisfy. Instead, the hallmark of secondary meaning remains "when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." <u>Commerce National</u>, 214 F.3d at 438 (internal citation and quotation marks omitted). As our non-exclusive list of factors clearly demonstrates, the consumers' interpretation of, and sentiment toward, the alleged marks are paramount in determining whether such marks have achieved

11

secondary meaning. On a defendant's summary judgment motion, the plaintiff has the burden to make a prima facie showing of its claims, before the court determines whether there is a genuine dispute of material facts because its failure to establish a prima facie case is a valid ground to grant the motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 2548, 2557 (1986) ("If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." (citation omitted)).

Plaintiffs have not presented evidence to show how consumers have perceived their alleged marks—their own alleged extensive usage and alleged copying by one other company do not alleviate their burden of showing how consumers identify these marks as being synonymous with the origin of their products, nor is the circumstantial evidence presented so overwhelming as to imply consumer association. See E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 199 (3d Cir. 2008) ("The evidence's core deficiency is that while it shows [the plaintiff] used the [alleged trademark] term . . . on many occasions over a long period of time, it does not show [it] succeeded in creating secondary meaning in the minds of consumers."). We support our conclusion on the point with an example. We are certain that at least some producer can readily make a strong showing on the six factors plaintiffs identified, through its sale of "Belgian chocolates," but surely that producer would not be entitled to trademark protection for that label no matter how long or pervasive its use of that label; consumers will never be in danger of associating that label with the producer. Therefore, we will affirm the judgment of the District Court on this ground.

12

C. "Peer-Spectives"

We likewise affirm the District Court's grant of summary judgment in favor of defendants that they did not infringe the alleged mark "Peer-Spectives," but we do so for a different reason than it set forth. The District Court held that "Peer-Spectives" is a suggestive mark and therefore enforceable as a trademark, but found that defendants did not infringe the mark. In contrast, we find that "Peer-Spectives" is not an enforceable trademark and therefore defendants could not have infringed it.

The District Court found the mark suggestive because "a 'mental leap' is required to tie PEER-SPECTIVES to online and in-person continuing medical education classes for physicians." Engage, slip op. at 23. "Absent this explanation, any link between the words and the healthcare industry would not have been immediately apparent, a clear indication that the mark is [] suggestive." Id. We disagree with the conclusion.

In A.J. Canfield Co. v. Honickman, we recognized that "[c]ourts and commentators have . . . difficulties [in] distinguishing between suggestive, descriptive, and generic marks." 808 F.2d 291, 296 (3d Cir. 1986).

> Despite this difficulty, these distinctions are crucial. If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. . . . If we hold a mark descriptive, a claimant can still establish trademark rights, but only if it proves that consumers identify the term with the claimant, for that identification proves secondary meaning. . . . The distinction between suggestive and descriptive may also dictate different standards for determining its scope of geographic protection.

Id. at 297 (citations omitted). We went on to attempt to provide some clarity to distinguish these categories by holding that:

13

> A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

Id. at 297 (citation omitted). In Canfield, we held that the term "chocolate fudge" was a descriptive term used to describe diet soda, because it denoted a particular flavor of diet soda, so "no imagination is required for a potential consumer to reach a conclusion about the nature of [the] soda. In accordance with the accepted definitions, 'chocolate fudge' as applied to diet soda cannot be suggestive." Id. at 298.

In this case, it is not difficult to see that "Peer-Spectives" is exactly the same kind of descriptive term as "chocolate fudge." It would be readily apparent to the average consumer that "Peer-Spectives" stands for "Peer Perspectives." Indeed, defendants' use of the phrase "Peers & Perspectives" is the very phrase plaintiffs assert infringed on their alleged mark. Peer perspective is a concept that most consumers immediately would recognize as a generally descriptive term that can be used to describe many products and applicable across a multitude of industries and markets, as is the term "chocolate fudge." We did not hold in Canfield that "chocolate fudge" was suggestive simply because consumers would not immediately associate it with diet sodas, nor did we find that it would take a "mental leap" for consumers to recognize its relevance as applied to diet sodas. Indeed, nothing in the standard we enunciated in Canfield requires a descriptive term to be tied to any particular industry or market.

In finding Peer-Spectives suggestive, the District Court paid special attention to plaintiffs' assertion that "'[p]eer' was chosen because health care professionals like to

14

talk Peer to Peer, and 'perspectives' was chosen because people want to hear key leader perspectives on certain medical information." Engage, slip op. at 23 (citation and quotation marks omitted). That should have been a strong indication that the term is descriptive. It does not take much imagination to recognize that a publisher in the healthcare industry would want "peer perspective" to be associated with its publications, just as a soda maker would want "chocolate fudge" to be a flavor associated with its products, and an ice cream maker would want "very creamy" to be a quality associated its products. Yet none of these terms immediately would conjure up images of their respective products.

If we accept the District Court's rationale, it could lead to an anomalous scenario where "very creamy ice cream" would be found to be clearly descriptive, but "very creamy," because its link to ice cream would not be immediately apparent, could nevertheless be trademarked by an ice cream maker. Of course, it is reasonable to believe that such ice cream maker would then attempt to enforce its trademark against every other ice cream maker who uses the term "very creamy ice cream" on its products, the very term that was deemed clearly descriptive in the first place.

As we have held, "[a]lthough the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, . . . the extensive use of the term in other markets may also have a weakening effect on the strength of the mark." A&H Sportswear, 237 F.3d at 223 (citation omitted). Widespread use of a term in many markets would suggest equally that the term is descriptive—indeed, if the "mental leap" required can be made in many markets, perhaps it is not much of a leap at all. "[I]f a

15

consumer is aware that a particular mark . . . is often used to designate a variety of products made by a variety of manufacturers, that consumer will be less likely to assume that in a particular case, two individual products, both with the mark [], come from the same source." Id. Unsurprisingly, a Google search of the term "peerspective" returned over 12,000 results, with a slew of examples of its use across many industries. See, e.g., Peerspective, http://peerspectiveadvisors.com (last visited Oc. 28, 2019); Peerspective, peerspective.mpi-sws.org (last visited Oct. 28, 2019); Peerspective: The developing a researched backed simulation to aid in bully intervention, F6S, http://f6s.com/peerspective (last visited Oct. 28, 2019); PeerSpective: Safeguarding the Future of your Organization, the Chamber of Commerce for Greater Philadelphia, http://apps.chamberphl.com/event/5384/peerspective (last visited Oct. 28, 2019); @Peerspective, Twitter, http://twitter.com/peerspective (last visited Oct. 28, 2019); Cunha BA, Typhoid Fever, the Typhus-Like Disease. Historical Peerspective, N.Y. State J. Med., Mar. 1982, at 321; Jennifer M. Schmidt, Why Didn't They Just Say That? PEERspective – A Complete Curriculum (2017). We cannot conclude that all of them, or at least many of them, somehow could obtain trademark protection.

"The evidentiary bar must be placed somewhat higher when the challenged term is particularly descriptive." E.T. Browne, 538 F.3d at 199 (citation and quotations omitted). Peer perspective is not a new concept invented by plaintiffs, and it certainly is not an obscure idea made popular by plaintiffs' use. The term itself is in fact "particularly descriptive." As the District Court found, "abbreviated or combined words are not necessarily suggestive," Engage, slip op. at 23, and that is even more so when in this

16

case, it is obvious what the term "Peer-Spectives" describes to a consumer.  In fact, its widespread use shows that such understanding appears to be universal to everyone, not just consumers.  Plaintiffs are correct that the evidentiary bar to grant summary judgment is high, and we are certain the bar had not been met when the District Court held that the term "Peer-Spectives" was an enforceable trademark as a matter of law.  But we also find there is inadequate evidence in the record to show that the term is more than merely descriptive, certainly not enough to create a genuine dispute of material facts that precluded the grant of the summary judgment.  And as we have already held, there is no evidence in the record that any of plaintiffs' alleged marks have achieved secondary meaning.  Hence, we will affirm the District Court's grant of summary judgment in favor of defendants, although not because defendants did not infringe an enforceable trademark, but because the mark was unenforceable in the first instance.

D.  State-Law Claims

Plaintiffs challenge the District Court's finding that "Lanham Act unfair competition claims and common law unfair competition claims are treated identically," and therefore if plaintiffs' Lanham Act claims failed, its state-law unfair competition claims also failed.  Engage, slip op. at 15 n.7.  We will affirm the District Court insofar that in this case, the standard is the same.  Although we do not decide whether there are material differences between a Lanham Act unfair competition claim and a New Jersey common law unfair competition claim, in general plaintiffs surely must demonstrate concrete and cognizable injury to establish either claim.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992).  Given that in both claims, plaintiffs'

17

alleged injury was defendants' unfair use and interference with their trademarks, once we found that the trademarks were unenforceable, there was no injury on either claim.[2] Thus, we will affirm the judgment of the District Court on this ground.

E. Plaintiffs' request for a Declaratory Judgment

Finally, plaintiffs contend the District Court erred when it found that it did not have jurisdiction over their declaratory judgment claim because defendants did not assert their trademarks have been infringed, and therefore it lacked jurisdiction to decide the validity of defendants' alleged trademarks. Plaintiffs, in turn, argue that the District Court misconstrued their declaratory judgment claim in which they asked the District Court to determine the relative priority of the parties' competing trademarks, not whether defendants' marks are invalid.

Even if we accept plaintiffs' characterization of their claim, the District Court did not have jurisdiction over the claim. Once we found that plaintiffs' alleged trademarks are invalid, there would be no need to determine priority between competing trademarks, because there are no competing trademarks. When a claim in a case lacks redressability, federal courts lack jurisdiction under the Constitution to hear the case. Lujan, 504 U.S. at 561, 112 S.Ct. at 2136. As such, we will affirm the District Court on the declaratory judgment claim.

---

[2] Indeed, although plaintiffs argue extensively in their brief regarding the alleged fraud defendants perpetuated on the PTO through false representation of defendants' alleged use of plaintiffs' competing trademarks, any injury that may have resulted under their theory of liability was no longer cognizable once we found that those trademarks were unenforceable.

18

## IV. CONCLUSION

For the reasons stated above, we will affirm the District Court's November 29, 2018 order in its entirety.